# United States District Court
# For the District of Massachusetts

| | |
|---|---|
| AMMA ABRAFI,<br><br>        PLAINTIFF,<br><br>v.<br><br>OFF-ROAD MOTOR SPORTS, INC. DBA<br>LAND ROVER PEABODY, and<br>BANK OF AMERICA, N.A.<br><br>        DEFENDANTS. | CIVIL COMPLAINT & JURY DEMAND |

## BASIS OF THE COMPLAINT

1. This action arises from Amma Abrafi's purchase of a 2013 Land Rover Range Rover Sport HSE Lux, VIN # SALKSK2D46DA786777 ("the Vehicle") on June 18, 2016 from Off-Road Motor Sports, Inc. DBA Land Rover Peabody, an auto dealership located at 247 Newbury Street in Peabody, MA, with corporate headquarters located at 7 Centennial Drive, Peabody, MA. In violation of the Truth in Lending Act, 16 U.S.C. § 1601, et seq, the Equal Credit Opportunity Act, and Section 2 of M.G.L. Chapter 93A, the Vehicle was sold to Ms. Abrafi through various false and deceptive means, including but not limited to, false advertising, inclusion of undisclosed price increases and costs, refusal to provide full disclosure of loan terms on the date of purchase, failure to provide written notice detailing an adverse credit action, and post-sale threats of arrest in order to induce Ms. Abrafi, under duress, to execute a loan agreement with wildly different and inflated terms from those represented to her on the date of purchase. Moreover, Bank of America has

been on notice of the fraudulent inducement and illegal nature of the loan assigned to it since at least late August or early September of 2016; and it continues to demand full payment despite its knowledge of the fraud.

## JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 15 U.S.C. § 1640 (TILA) and U.S.C. § 1691e(f) (ECOA).

3. This Court has authority to issue a declaratory judgment pursuant to 28 U.S.C. § 2201 and § 2202.

4. This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5. Venue in this District is proper under 28 U.S.C. § 1391 because a substantial part of the events and omissions complained of took place in this District and Off-Road Motor Sports, Inc. maintains offices, transacts business, and is otherwise found in this district.

## PARTIES

6. Plaintiff Amma Abrafi ("Ms. Abrafi") is a natural person residing in East Hartford, Connecticut.

7. Defendant Off-Road Motor Sports, Inc., DBA Land Rover Peabody, is a domestic corporation operating a new and used automobile dealership with a business address of 247 Newbury Street, Peabody, MA and a corporate headquarters address of 7 Centennial Drive, Peabody, MA. The Defendant is in business selling used cars to consumers on a retail installment basis.

Case 1:17-cv-11115 Document 1 Filed 06/15/17 Page 2 of 18

8. Bank of America, N.A. ("Bank of America") is a national bank engaged, *inter alia*, in extending credit and creating and/or purchasing and taking assignment of Retail Installment Sales Agreements for consumer goods in the Commonwealth of Massachusetts, as well as other states, and is the alleged holder of the Retail Installment Agreement for the purchase of the subject Vehicle. Bank of America has a Principal Office located at 100 N. Tryon Street, Charlotte, North Carolina 28202.

9. In addition to being liable for any of its own wrongdoing, Bank of America is liable to Plaintiff for any claim that may be asserted against the Dealership as the alleged holder of Plaintiff's Retail Installment Sales Agreement ("the RISA"), under the FTC Holder Rule, 16 C.F.R. Part 433 (Holder Rule) and as incorporated in the RISA itself.

## FACTUAL ALLEGATIONS

10. Ms. Abrafi saw an ad for the Vehicle online in early June 2016 that indicated a sale price of $44,989. See Exhibit 1, attached.

11. Ms. Abrafi called the Dealership at the time to confirm that the Vehicle was available still for sale at the advertised price and was told it was.

12. On June 18, 2016, Ms. Abrafi an immigrant from Ghana with a very limited ability to read English, traveled to the dealership from her home in East Hartford, CT to look at the Vehicle and inquire further about purchasing it.

13. At her visit to the Dealership, Ms. Abrafi met with a sales agent "Eric" who again confirmed the sale price of $44,989.

14. After a test drive with Eric, Ms. Abrafi explained to him that she intended to purchase the

Vehicle for the advertised price and wanted to put down $10,000 in cash and finance the remainder.

15. Eric accepted $1,000 in cash from her that day and advised that the remaining $9,000 needed to be paid upon delivery of the Vehicle in Connecticut on a later date.

16. Eric then introduced Ms. Abrafi to Leo Lemos who appeared to be the finance representative for the Dealership.

17. Mr. Lemos presented Ms. Abrafi with a purchase agreement that listed the advertised sale price of $44,989, credited her for a down payment, and indicated a finance amount of about $35,288, which is exactly the amount she expected to borrow for the transaction. See Exhibit 2, attached with proof of down payments received.

18. Mr. Lemos further explained that he was "giving" Ms. Abrafi a 7-year "warranty" on the Vehicle that would only increase her loan payments by $50 each month.

19. Finally, Mr. Lemos promised Ms. Abrafi that after reviewing her application for credit he had obtained a loan for that amount at 2.99% interest with 60 monthly payments of $650.

20. Ms. Abrafi asked for copies of the agreement reflecting all terms, but Mr. Lemos refused to provide them and explained that "Bank of America" would mail everything to her on a later date.

21. Ms. Abrafi was told that the deal was set and that the Vehicle would be delivered to her at the Enfield, CT DMV early the following week.

22. On or about June 21, 2016, Ms. Abrafi met "Eric" at the DMV in Enfield, CT where Eric took care of registering the Vehicle in Connecticut and delivery of the Vehicle.

23. Ms. Abrafi provided Eric with the remaining $9,000 on her deposit and received the Vehicle and her registration documents, but still had not received any purchase contracts

Case 1:17-cv-11115-JCB   Document 1   Filed 06/15/17   Page 4 of 18

or loan documents.

24. On or about early to mid-July, Ms. Abrafi received mail from dealership representative Leo Lemos that contained an unsigned Retail Installment Sales Agreement (RISA) for the financing of the Vehicle.

25. It showed an alarmingly higher cash price for the Vehicle of $52,781 (which did not include sales tax), and it added $895 for "optional" GAP Waiver that was never discussed with Ms. Abrafi.

26. In total, it required Ms. Abrafi to borrow $43,975.00, which is $8,587 more than the finance amount of $35,388 she was promised on June 18, 2016 when she consummated the deal.

27. Even more disturbing to Ms. Abrafi, the RISA contained an APR disclosure showing 6.24% and indicated that in addition to the $10,000 she had put down she would pay $52,969.68 over the life of the loan.

28. [That is, Ms. Abrafi would pay $62,969.68 for a vehicle that was advertised for sale for $44,989. See Exhibit 3, attached.

29. Ms. Abrafi called Mr. Lemos at that time to ask why he had sent the RISA to her with such inflated amounts at a higher interest.

30. Mr. Lemos explained that he had attempted to obtain a 2.9% interest loan from a Credit Union but that Ms. Abrafi was denied such a loan and so he had to obtain a Bank of America loan for her at the higher interest.

31. Neither the Dealership nor any credit union has at any time, however, sent Ms. Abrafi a letter advising her of an adverse credit action declining a loan application.

32. Ms. Abrafi told Mr. Lemos that she had no intention of signing the RISA as she had

already purchased the Vehicle, put down $10,000, and expected to borrow much less money at the interest rate promised on June 18, 2016.

33. Mr. Lemos then stated that if she would sign this RISA he would allow her to come back to the dealership in 6 months to refinance.

34. Ms. Abrafi again refused to sign the RISA.

35. Mr. Lemos hung up the phone at that point in time.

36. Shortly thereafter, Ms. Abrafi called Eric to ask what had happened and explained that she was supposed to get 2.99% on a lower balance.

37. Eric apologized and agreed to speak to Mr. Lemos and to take care of the situation.

38. Approximately one week later, Ms. Abrafi called back the dealership on or about mid-late July and asked for Leo Lemos. She was informed that Leo no longer worked at the Dealership.

39. Instead she spoke with a man named Keith, to whom she explained her situation.

40. Keith explained that the dealership "computer" did show that she had been denied a loan by a Credit union.

41. Confused and frustrated by this information, Ms. Abrafi made an additional call to Eric about this time and asked for his help. Eric apologized again for the confusion and promised that he would look into things for her.

42. In or about the last week of July, however, Ms. Abrafi had still not received an answer from the Dealership regarding the increase in price, costs, and lending terms.

43. Ms. Abrafi still had not received a bill from Bank of America.

44. Eventually Keith called Ms. Abrafi and, in no uncertain terms, told her that she must sign the RISA or the Dealership would not get paid by Bank of America for the Vehicle.

Case 1:17-cv-11115 Document 1 Filed 06/15/17 Page 6 of 18

45. When Ms. Abrafi again refused to sign this document, Keith threatened that he would call the police, and hung up the phone.

46. Terrified that she was going to be arrested, Ms. Abrafi called back the Dealership, on or about the next day, and spoke with Eric and explained that Keith threatened to call the police on her.

47. Eric apologized and again offered to look into the situation.

48. Shortly thereafter, Ms. Abrafi received a call from a different person at the Dealership who explained that she did have to sign the RISA and that she could not drive the car until she did.

49. On or about August 2, 2016, the Dealership emailed Ms. Abrafi informing her that the Dealership would provide her with $735.69 to pay the first month's payment to Bank of America "due to the fact that we mistakenly thought the loan had already been funded in which it has not". See Exhibit 4, attached.

50. Again, in the email the Dealership demanded that Ms. Abrafi sign the inflated RISA she had received.

51. Still fearful that she could be arrested for something if she did not sign, Ms. Abrafi felt she had no choice and under duress, signed the RISA and returned it to the Dealership by mail.

52. Significantly, the RISA was mailed to Ms. Abrafi at her home in East Hartford, Connecticut.

53. It was demanded that she review and sign it there, outside of the Commonwealth of Massachusetts.

54. As an agreement for the sale of consumer goods consummated at a location other than the

Case 1:17-cv-11115 Document 1 Filed 06/15/17 Page 7 of 18

seller's place of business, it should have included a statement on the front page in at least 10-point font that advised Ms. Abrafi that she had a right to cancel the contract at any time within 3-days of signing under M.G.L. c. 93 § 48.

55. The RISA does not contain that language anywhere on it. See Exhibit 3, attached.

56. It does, however, appear to have been backdated by the Dealership to make it appear as if it was signed on June 18, 2016 at the Dealership.

57. The same applies to the additional Purchase Agreement attached at the back of the RISA which was drafted, no doubt, to reflect the higher loan terms and back dated to appear as if it too was signed on June 18 at the dealership. See Exhibit 5, attached.

58. Later in August of 2016, Ms. Abrafi received her first bill from Bank of America.

59. Upon reviewing it, she saw that her balance was over $43,000, which meant that she was not getting credit for about $9,000 of her deposit under the fraudulent loan terms she was induced to sign under false threat of arrest.

60. Highly distressed by this, she went to her local Bank of America branch in Manchester, Connecticut to review the transaction with a bank representative.

61. On or about August 26, 2016, Ms. Abrafi met with a female agent at the branch on 14 N. Main Street in Manchester, CT.

62. The Representative reviewed the documents with Ms. Abrafi which included the original purchase agreement signed on June 18, 2016, a second purchase agreement which reflected the fraudulently increased price and costs, and the RISA signed under false threat of arrest.

63. The Branch representative agreed that the transaction did not look right and called the Dealership and spoke with Keith, with Ms. Abrafi present in the room.

64. The branch representative asked Keith why the dealership had increased the price of the vehicle after Ms. Abrafi signed the purchase and sale agreement on June 18, 2016.

65. The Bank representative reported to Ms. Abrafi, that Keith was rude, refused to explain anything and eventually hung up the phone.

66. Since that time Ms. Abrafi has made all monthly payments under this fraudulently induced loan agreement.

67. Through Counsel, Ms. Abrafi contacted all Defendants by letter dated October 15, 2016, and sought return, rescission, and refund under Ch. 93A. See Exhibit 6, attached for evidence of mailing of Plaintiff's pre-litigation demand with USPS Certified Return Receipts and other evidence indicating receipt of said letter, attached to this Complaint.

68. The Dealership failed to provide any response or counter offer, though they received Plaintiff's pre-litigation demand under 93A. Again, see Exhibit 6, attached.

69. Bank of America responded through its Regulatory Complaints Department by letter dated January 12, 2017. See Exhibit 7, attached.

70. That is, Bank of America failed to respond within 30 days of receiving counsel's letter, as required under 93A. See Exhibit 6, showing Bank of America's receipt of the letter on December 9, 2016.

71. Moreover, Bank of America failed to provide any counter offer, though they received Plaintiff's pre-litigation demand under 93A. See Exhibit 6, attached.

72. Instead they denied any liability for the Dealership's actions, despite the Holder Rule language contained in the RISA.

73. Furthermore, Bank of America alleged to have received an initial loan package from the Dealership in June 2016, which was rejected, allegedly, due to incomplete signatures.

9 | Page

Case 1:17-cv-11115-JCB Document 1 Filed 06/15/17 Page 9 of 18

74. But in their response letter, Bank of America acknowledged that they now have no documents related to the alleged "original" application and only have documents which the dealership sent in August 2016.

75. Despite these unreasonable responses, or lack thereof, Ms. Abrafi made several additional attempts to resolve this matter, all of which were rejected or ignored.

76. As these responses, or lack thereof, are unreasonable, Plaintiff commences suit.

77. In addition to being liable for any wrongdoing conducted by itself or on its behalf by its agents, Bank of America is also liable to Plaintiff for any wrongdoing committed by the Dealership as the holder of the RISA, and as incorporated in the RISA itself.

## COUNT I
### Violations of the Equal Credit Opportunity Act, 15 U.S.C. § 1691
### (As to all Defendants)

78. Plaintiff repeats and re-alleges and incorporates by reference the preceding paragraphs.

79. Dealership regularly extends or arranges for the extension of credit for consumers to purchase vehicles at the Dealership.

80. Accordingly, the Dealership is a "creditor" under ECOA as defined at 15 U.S.C. § 1691a(e) and Regulation B, 12 C.F.R. § 1002.1(a).

81. As described above, Ms. Abrafi applied to purchase the Vehicle with money down and the balance to be financed.

82. As set forth above, the Dealership informed Ms. Abrafi that although they had attempted to obtain financing through a credit union, the application for credit was denied.

83. Accordingly, she was to be provided with written notice of denial or "adverse action" outlining reasons for the denial or at least providing notice of the applicants right to a statement of the reasons for the denial under 15 U.S.C. § 1691(d)(1) and (2).

Case 1:17-cv-11115-JCB Document 1 Filed 06/15/17 Page 10 of 18

84. Neither the Dealership or any other creditor has at any time ever provided any such statement.

85. Accordingly, the Dealership violated ECOA 15 U.S.C. § 1691 by failing to provide a written notice of adverse action which accurately stated the reasons for the denial (15 U.S.C. §1691(d)(2)(b)).

86. Had the Dealership and any Credit Union it contracts with provided Ms. Abrafi with the required written notice of denial outlining the reasons for that denial, Ms. Abrafi would not have signed any RISA provided on higher terms and would have sought other options for affordable financing.

87. As a result of the above alleged ECOA violations, Dealership is liable to Plaintiff for her actual damages pursuant to 15 U.S.C. § 1691(e)(a), for punitive damages of $10,000.00 pursuant to 15 U.S.C. § 1691e(b) and for attorney's fees and costs pursuant to 15 U.S.C. § 1691e(d).

88. Ms. Abrafi's damages include, but are not limited to, the difference between the cost of the loan obligation currently claimed by Bank of America and the cost of the loan she was originally promised on June 18, 2017.

89. Pursuant to the Federal Trade Commission Rule on preservation, Bank of America is subject to this claim, as the Holder of the RISA, and as incorporated in the RISA itself.

## COUNT II
### TRUTH IN LENDING ACT, 15 §§1601 et seq. ("TILA")
### (As to Dealership Defendant)

90. Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

Case 1:17-cv-11115 Document 1 Filed 06/15/17 Page 11 of 18

91. Plaintiff's transaction as described herein was a consumer credit transaction within the meaning of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and Federal Reserve Board Regulation Z, 12 C.F.R. part 226.

92. The Dealership regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments.

93. The Dealership is a creditor within the meaning of TILA and Regulation Z (e.g. § 226.2(a))

94. The RISA is a written agreement payable in more than four installments.

95. The RISA is a consumer credit transaction within the meaning of the TILA 15 USC § 1602, and Regulation Z § 226.2.

96. The finance charge indicated on the RISA exceeds $1,000.00

97. Prior to the consummation of the RISA, Plaintiff was not provided with the TILA disclosures in a form that she, as a consumer, could keep, nor in any form at all.

98. The increase in the cash price of the vehicle from the originally confirmed price of $44,989 and all other previously undisclosed increases amount to a "finance charge" as defined under TILA § 1605(a) and Regulation Z § 226.4(a).

99. The cash price increase of over $8,500 is attributable to items and charges that Plaintiff was required to pay incident to the extension of credit to Plaintiff, and is a "finance charge" as defined under TILA § 1605(a) and Regulation Z § 226.4(a).

100. As a result of Defendant's failure to properly include these and/or other fees and charges as finance charges, the sale price, finance charge, amount financed, and APR disclosed in

Case 1:17-cv-11115-JCB Document 1 Filed 06/15/17 Page 12 of 18

Plaintiff's RISA are all materially misstated, in violation of TILA and Regulation Z. e.g. § 1638(a)(2) through (5) and §226.18(b), (d), (e), and (h).

101. Defendant Dealership has failed to provide Plaintiff with clear and conspicuous disclosures of the terms of the loan as required under TILA and Regulation Z. e.g. 15 U.S.C. § 1632(a), § 1638(a), and Regulation Z, e.g. 12 C.F.R. § 226.17(a)(1).

102. As a result of Defendant's incomplete, inaccurate, and materially misstated disclosures, Plaintiff has suffered actual damages, including but not limited to the over $8,500 in increases and all subsequent interest stemming from that increase that the dealership as required as a condition of receiving financing.

103. Indeed, the Dealership never even provided any RISA with TILA disclosures until after the sale of the Vehicle, after delivery of the Vehicle, and after the Dealership assisted Ms. Abrafi in registering the Vehicle in Connecticut on June 21, 2016.

104. Had Defendant provided complete and accurate disclosure of all terms, costs, finance charges and interest rates, Plaintiff would not have agreed to purchase the vehicle on the terms and conditions imposed on him by the Defendants and instead would have sought to purchase a vehicle without the unwanted and unnecessary warranties and additional charges imposed on him by the Defendants.

105. Additionally, had Defendant provided complete and accurate disclosure of all terms, costs, finance charges and interest rates, Plaintiff would have sought and obtained alternate, lower cost financing.

106. For all these reasons, Defendant Dealership is liable under TILA and Regulation Z (see, e.g. 15 U.S.C. §§ 1640 and 1641) for statutory damages, actual damages, attorney's fees,

13 |

Case 1:17-cv-11115-JCB Document 1 Filed 06/15/17 Page 13 of 18

litigation expenses and costs, for a declaratory judgment that they have violated TILA and Regulation Z, and for such other or further relief as the Court deems appropriate.

## COUNT III AS TO ALL DEFENDANTS
### Violations of G.L. c. 93A, Section 2, and Code of Massachusetts Regulations Promulgated thereunder
### (As to All Defendants)

107. Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

108. At all relevant times, Defendants have been engaged in trade or commerce as defined in c.93A.

109. Defendants, through their agents and employees acting in the course of their employment or agency, engaged in unfair or deceptive acts or practices including;

   a. Falsely advertised the vehicle for a price lower than the actual amount charged to Ms. Abrafi after she had made all required down payments and taken delivery of the Vehicle in violation of 940 CMR 5.02(6);
   b. Increased the price of the motor vehicle after they had accepted Ms. Abrafi's offer to purchase it in violation of 940 CMR 5.04(10);
   c. Failed to provide all necessary disclosures of the loan terms in writing at the time of the transaction on June 18, 2016 in violation of the Truth in Lending Act, 15 USC § 1632, which creates a separate violation of M.G.L. 93A § 2 under 940 CMR 3.16;
   d. Failed to provide notice of an adverse credit action when Ms. Abrafi was allegedly turned down for a loan on the terms promised to her on June 18, 2016 in violation of the Equal Credit Opportunity Act, 15 USC § 1691, which creates a separate violation of M.G.L. 93A § 2 under 940 CMR 3.16;
   e. Failed to provide written notice that a contract signed at a location other than the Dealership could be rescinded within 3-days in violation of M.G.L. 93 § 48, which creates a separate violation of M.G.L. 93A § 2 under 940 CMR 3.16; and
   f. Engaged in unfair, abusive and unconscionable behavior, including the use of false statements and warranties about the amount and terms of financing, the use of contracts that the dealership did not intend to honor, and the false threat of arrest to induce execution of the fraudulently prepared and back-dated RISA.

110. For its part, Bank of America has known of the fraudulent nature of the RISA since in or around late August 2016 at the time of Ms. Abrafi's visit to the branch in Manchester, CT, as described above,, yet they continue to collect on the loan. This constitutes Bank of

Case 1:17-cv-11115-JCB Document 1 Filed 06/15/17 Page 14 of 18

America's own direct violation of M.G.L. 93A *See Mckensi v. Bank of Am.*, 2010 U.S.Dist. LEXIS 99540, *7-10 (D. Mass. Sept. 22, 2010)(assignee itself violates 93A by enforcing debt known to be originated through unfair and deceptive means);

111. In all the actions described herein, Defendants acted in a knowing or willful manner.

112. All Defendants received Plaintiff's demand for resolution under 93A, through counsel, as described above. See <u>Exhibit 6</u>, attached.

113. At all relevant times, Defendants refused to make a reasonable settlement offer.

114. As a result of Defendants' violations of 93A, Plaintiff has suffered damages measured as the difference between the cost of the Vehicle as advertised and financing as warranted on June 18, 2016 and the cost of purchase and financing that Plaintiff was forced into through abusive and false threats of arrest and use of a back dated RISA.

115. Had the Dealership acted honestly and either told Plaintiff that financing was not available on the terms promised on June 18, 2016 or that the vehicle was actually more expensive than advertised, Plaintiff would not have purchased and financed the Vehicle on the terms contained in the RISA she was forced to sign under threat of false arrest.

116. Defendants' refusals to grant reasonable relief upon demand were in bad faith with knowledge or reason to know that their conduct violated G.L. c. 93A, § 2, entitling Plaintiffs to pursue enhanced damages, counsel fees and costs pursuant to G.L. c. 93A, § 9.

117. Pursuant to the FTC Holder Rule on preservation of consumer claims, Bank of America is subject to this claim against the Dealership, as the Holder of the RISA, and as incorporated in the RISA itself, in addition to any of its own wrongdoing.

## COUNT VI AS TO ALL DEFENDANTS
### Negligent Misrepresentations

Case 1:17-cv-11115-JCB Document 1 Filed 06/15/17 Page 15 of 18

**(As to All Defendants)**

118. Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

119. The Dealership, in the course of their business selling used cars, provided false information to Plaintiff about the cost of the Vehicle and the cost of financing its purchase, as described above, in a manner that was at least negligent.

120. The Dealership knew or should have known that its advertising was inaccurate and that the Purchase Agreement it offered and signed on June 18, 2016 was inaccurate.

121. Accordingly, the Dealership failed to exercise reasonable care or competence in communicating information about the vehicles it advertises and sold to Plaintiffs during the sale and financing transaction.

122. Plaintiff, as described above, reasonably relied on the Defendants' representations and omissions.

123. As a result of her reasonable reliance on what was in actuality the Defendants' lack of reasonable care and competence, Plaintiff has suffered losses and damages as described above.

124. Had Defendants provided complete information about the Vehicle price and cost of financing, Plaintiff would not have purchased the Vehicle.

125. As a result, she is entitled to her actual damages as described above.

126. Pursuant to the Federal Trade Commission Rule on preservation, Bank of America is subject to this claim, as the Holder of the RISA, and as incorporated in the RISA itself.

### COUNT VII AS TO ALL DEFENDANTS
### Violations of G.L. c. 231 § 85J
**(As to all Defendants)**

127. Plaintiff repeats and re-alleges and incorporates by reference the preceding paragraphs.

Case 1:17-cv-11115 Document 1 Filed 06/15/17 Page 16 of 18

128. As described in Plaintiffs claims for 93A and Negligence, the Dealership made deceitful statements in the sale of a used vehicle, i.e. personal property.

129. Dealership also was deceitful in pricing the Vehicle.

130. Dealership was deceitful in describing the terms of the loan for financing.

131. Dealership was deceitful in describing or implying that Ms. Abrafi was doing something illegal by refusing to sign a RISA with fraudulently inflated costs.

132. As described above, Plaintiff reasonably relied on these deceitful and fraudulent representations and omissions and suffered the damages and losses described above.

133. Had Defendants provided complete information about the Vehicle sold, including the actual price, loan costs, and loan terms, Plaintiff would not have purchased the Vehicle.

134. Accordingly, the Dealership is liable to Plaintiff under M.G.L. c. 231 § 85J for treble their actual damages.

135. Pursuant to the Federal Trade Commission Rule on preservation, Bank of America is subject to this claim, as the Holder of the RISA, and as incorporated in the RISA itself.

## COUNT IX DECLARATORY RELIEF

136. The above-allegations are incorporated by reference herein.

137. In accordance with Mass. G. L. c. 231A, et seq., Plaintiffs seek a determination that the RISA is based on omissions and misrepresentations in violation of M.G.L. c. 93A.

138. Accordingly, Plaintiffs seek a further order against Bank of America declaring the RISA void and unenforceable.

## DEMAND FOR RELIEF

**WHEREFORE**, plaintiff prays that this Honorable Court enter judgment in her favor:

Case 1:17-cv-11115 Document 1 Filed 06/15/17 Page 17 of 18

(a) Against defendant the Dealership for compensatory damages, including incidental and consequential damages;

(b) Against defendant the Dealership for treble damages pursuant to G.L. c. 93A, or in the alternative under G.L. c. 231 § 85J;

(c) Against defendant Bank of America, as holder, for actual damages up to amounts paid under the RISA;

(d) Against defendant Bank of America, for its own wrongdoing, for treble damages pursuant to G.L. c. 93A;

(e) Against all defendants jointly and severally for costs and reasonable attorney fees pursuant to G.L. c. 93A;

(f) Against Bank of America, for an order under M.G.L. c. 231A, et seq., declaring the RISA void and unenforceable; and

(g) For such other and further relief as this Honorable Court shall deem just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all claims so triable.

Dated: June 15, 2017

> Respectfully submitted,
> Amma Abrafi
> By her Counsel,
>
> _/s/ Peter T. Lane_
> Peter T. Lane, Esq.
> 60 Masonic Street, Suite E
> Northampton, MA 01060
> peter@peterlanelaw.com
> 413-232-1498
> BBO#: 673748

Case 1:17-cv-11115 Document 1 Filed 06/15/17 Page 18 of 18